# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff,<br>       vs.<br><br>CESAR DIAZ,<br><br>                          Defendant. | CASE NO. 08CR3661 WQH<br><br>ORDER |

HAYES, Judge:

The matter before the Court is the motion to suppress wire and electronic communication evidence filed by Defendant Cesar Diaz. (Doc. # 77).

## BACKGROUND FACTS

On October 23, 2008, the grand jury returned the indictment in this case charging Defendant Cesar Diaz in Count 1 with knowingly and unlawfully possessing a semi-automatic pistol in violation of 18 U.S.C. § 922(g)(1) and 924; in Count 2 with knowingly and unlawfully possessing ammunition in violation of 18 U.S.C. § 922(g)(1) and 924; and in Count 3 with being an alien who was illegally and unlawfully in the United States, knowingly and unlawfully possessing a semi-automatic pistol in violation of 18 U.S.C. § 922(g)(5) and 924.

From March 2005 to October 2008, the North County Regional Gang Task Force investigated the Varrio Posole Locos street gang ("the Posole gang"). In November of 2006, law enforcement officials applied for wiretap authorization seeking to intercept the wire communications to and from a cell phone number (T-1) subscribed to and used by Jesus Gonzalez. The affidavit in support of the November 2006 application was prepared by Federal Bureau of Investigation ("FBI") Special Agent Patrick Casey. Special Agent Casey declared

that Jesus Gonzalez, an alleged Posole gang member, and other gang members are involved in the distribution of narcotics and the extortion of money in the form of taxes from other drug dealers. The affidavit detailed two drug deals which took place on August 11, 2006 and on August 29, 2006. In each of these drug deals, law enforcement used a confidential informant to purchase methamphetamine from Gonzalez. Special Agent Casey stated in part in the affidavit:

> In addition to narcotics trafficking, the Posole gang is also involved in the extortion of other criminals, primarily drug dealers - these criminals are required to pay a 'tax' to the Posole gang in order to conduct their illegal activities. At least part of the proceeds from this 'taxing' by the Posole gang are, in turn, sent to the Mexican Mafia prison gang as a 'tax.' The Posole gang appears to transfer money to Jesse Moreno Sr., aka Big Jess, who, I believe, is both a validated member of the Mexican Mafia and the head of the Posole gang. Moreno is presently incarcerated in the federal prison system due to convictions for narcotics and weapons charges. Moreno's sons (Valentino Moreno... Joseph Moreno...; and Jesse Moreno, Jr. ...) are also leaders of the Posole gang, with Valentino overseeing the day-to-day activities of the gang. A great majority of the leaders of the Posole gang are related in some fashion by blood and/or marriage. For example, Frank Sandoval ..., one of Valentino's most trusted lieutenants in the gang, is also believed to be Moreno's cousin.
> ...
> Following the drug deals on August 11 and August 29, CI-1 informed us that he was contacted by Jenny Moreno, the grandmother of Valentino Moreno, who I believe is involved in the gang's illegal activities including the extortion operation. Jenny Moreno told CI-1 that he owed her $100 for selling narcotics in the area controlled by the Posole gang; she further informed CI-1 that she was 'taxing' (i.e. extorting money) under the authority of Valentino Moreno. CI-1 provided Jenny Moreno with an initial payment of $20. CI-1 has informed us that Valentino Moreno subsequently attempted to find CI-1 at CI-1's residence on a number of occasions apparently to collect remaining monies owed to the Posole gang as 'taxes.' We believe that Gonzalez identified CI-1 as an active drug dealer to the Posole gang so that CI-1 could be subjected to 'taxing.'

(November 2, 2007 Affidavit, pages 3 and 9).

In the "Necessity" section of the affidavit, the Special Agent Casey detailed the investigative procedures tried to date including undercover operations, informants and other cooperators, physical surveillance, searches and seizures, grand jury and subpoenas, witness interviews, phone analysis, and prior wiretaps. Special Agent Casey provided specific details regarding the informants and stated that Valentino Moreno may have become suspicious of CI-1, and that CI-2 has refused to have any more dealings with gang members out of fear for personal safety. Special Agent Casey stated that the "sensitivity of Posole gang members to

potential cooperators/informants appears to have been increased by the recent arrest of the gang's leader pursuant to a Mexican Mafia investigation" and "the Posole gang's reputation for extreme violence has significantly limited law enforcement's ability to develop cooperators or informants." (*Id.* at 14). The affidavit of Special Agent Casey further reviewed the efforts made in undercover operations and concluded that "the infiltration of an agent does not appear likely to succeed given the structure of the gang and its sensitivity to law enforcement." (*Id.* at 15). Special Agent Casey described in detail physical surveillance efforts, searches and seizures, grand jury interviews, phone analysis, and prior wiretaps utilized by law enforcement prior to the November 2006 application for wiretap. (*Id.* at 17-25).

On November 2, 2006, this district court judge found that there was probable cause to believe that Jesus Gonzalez and others have committed and will continue to commit the crimes of distribution of controlled substances, conspiracy, importation of controlled substances, as well as other named crimes. The Court found that there was probable cause to believe that the particular wire communications concerning these criminal activities will be obtained through the requested interceptions. The Court concluded that "[i]t has been adequately established that normal investigative procedures have been tried and failed, reasonably appear unlikely to succeed if tried, or are too dangerous to employ." (November 2, 2006 Order, page 3). The Court authorized the interception of wire communications over T-1 for a thirty day period.

After interception of T-1, the Government sought authorization in January of 2007 to intercept calls to and from a cell phone subscribed to and used by Frank Sandoval (T-2). The January 2007 application outlined the same offenses set forth in the November 2006 application. The January 2007 application was supported by the affidavit of FBI Special Agent Sharna Skjei. This Court signed the order authorizing the requested wiretap on January 11, 2007.

In March of 2007, the Government sought an order to authorize the continued interception of the wire communications of Frank Sandoval, Valentino Moreno, Cesar Diaz, Jesus Gonzalez, and other named persons to and from the cell phone (T-2) subscribed to and used by Frank Sandoval; a cell phone (T-3) subscribed to and used by Valentino Moreno; and

a cell phone (T-4) subscribed to by Maria Perez believed to be "used by Jesse Patrick Moreno, Jr. currently incarcerated with the California Department of Corrections and Rehabilitation at Ironwood State Prison." (March 6, 2007 Affidavit, page 3). The March 2007 application outlined the same offenses set forth in the initial November 2006 application and in the January 2007 application. The March 2007 application was supported by the affidavit of FBI Special Agent Skjei. The affidavit of Special Agent Skjei "incorporated in full" for review by the Court the affidavit submitted in support of the November 2006 wiretap order and the affidavit submitted in support of the January 2007 wiretap order. (March 6, 2007 affidavit, page 4).

Special Agent Skjei outlined in detail significant developments in the investigation since the January 11, 2007 order. Based upon intercepted calls over T-2, Special Agent Skjei stated that she believed that Frank Sandoval is engaged in narcotics trafficking, firearms trafficking, and collecting extortion money on behalf of Valentino Moreno and the Posole gang. Special Agent Skjei further stated:

> Based upon intercepted calls over T-2, Posole gang members appear to have conducted a residential burglary in the gang's Oceanside neighborhood, and stole amongst other things, six to eight firearms, a gun locker, and ammunition. I believe that these weapons have been distributed to a number of Posole gang members who have violent criminal histories. For example, pursuant to intercepted calls, at least one weapon appears to have been smuggled into Mexico and delivered to Gerardo Mendoza. Moreover, it appears that at least one weapon has been provided to a Posole gang member to commit violence due to an ongoing conflict with another individual. Based upon intercepted calls, the Posole gang appears to be involved in the smuggling of narcotics into penal facilities for use and/or sale by incarcerated Posole gang members, including Jesse Moreno Jr., Valentino Moreno's brother and another leader of the Posole gang. We have also identified a cellular telephone which I believe is being used by Jesse Moreno, Jr., who is incarcerated, to conduct business outside the penal facility - we are presently unsure as to how Moreno was able to obtain a cell phone in prison and how he is able to use it on a consistent basis while in prison.... Given the apparent access to contraband, including a cell phone, I believe that there is a significant risk that Jesse Moreno, Jr. may have correctional officers providing him with assistance in his illegal activities.

(*Id.* at 4-5). Special Agent Skjei outlined in detail specific intercepted conversations involving Valentino Moreno, Frank Sandoval, and others between January 11, 2007 and February 9, 2007 involving trafficking in marijuana, heroin, methamphetamine and cocaine as well as trafficking in illegal firearms. (*Id.* at 7-15).

1  On March 6, 2007, the Court signed an order that authorized the continued interception of communications and text messages over T-2 subscribed to and used by Frank Sandoval; T-3 subscribed to and used by Valentino Moreno; and T-4 subscribed by Maria Perez and used by Jesse Moreno, Jr. in prison. (March 6, 2007 Order, page 2).

## CONTENTIONS OF THE PARTIES

Defendant moves the Court to suppress all evidence obtained from the March 6, 2007[1] wiretap order and any wiretap orders entered thereafter. Defendant contends that 1) the application and supporting materials lack a statement of facts sufficient to support the finding that the wiretap was necessary; 2) the wiretap was not necessary as traditional investigatory techniques capable of producing sufficient evidence were neither used nor exhausted; 3) there was sufficient evidence to arrest and prosecute the targets of the investigation prior to the March 2007 application; and 4) the Government did not obey the minimization requirements of the March 2007 wiretap order.

The Government contends that the affidavit in support of the March 2007 wiretap application fully and completely discussed other investigative methods and adequately set forth facts to establish necessity under 18 U.S.C. §§ 2518(1)(c) and 2518(3)(c). The Government asserts that the March 2007 application was necessary to develop an effective case against those involved in the conspiracy, including the multiple users of T-4 in the jail. Finally the Government asserts that there was probable cause to intercept the communications over T-4 and that the transfer to another user in no way affected the finding of probable cause or the Government's authority to intercept communication over T-4.

## ANALYSIS

<u>Necessity under Section 2518(1)(c) and Section 2518(3)(c)</u>

Wiretap authorizations are governed by the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510-2522. "To obtain a wiretap, the government must overcome the statutory presumption against this intrusive investigative method by proving necessity."

---

[1] Defendant does not challenge the November 2006 or the January 2007 wiretap. The Government presents no challenge to Defendant's standing to challenge the March 6, 2007 wiretap order.

1  *United States v. Rivera*, 527 F.3d 891, 897 (9th Cir. 2008)(citations omitted).  The purpose of
2  this requirement is to "assure that wiretapping is not resorted to in situations where traditional
3  investigative techniques would suffice to expose the crime."  *United States v. Kahn*, 415 U.S.
4  143, 153 n.12 (1974).  A judge must "determine that the ordinary investigative technique
5  employing a normal amount of resources have failed to make the case within a reasonable
6  period of time."  *United States v. Spagnuolo*, 549 F.2d 705, 711 (9th Cir. 1977).  However,
7  "the government need not exhaust every conceivable investigative technique in order to show
8  necessity."  *United States v. Bennett*, 219 F.3d 1117, 1122 (9th Cir. 2000)(citation omitted).
9  *Full and Complete Statement of Facts*

10  Defendant contends that the affidavit in support of the March 2007 application does not
11  contain a full and complete statement of facts necessary to support the finding of necessity
12  because the affiant relied upon the previous affidavits in support of the November 2006 and
13  the January 2007 wiretap applications. Defendant contends that the Court did not make an
14  individualized necessity determination because the affiant incorporated prior affidavits into the
15  March 2007 affidavit in support of the March 2007 application.  Defendant asserts that the
16  issuing judge "cannot rely upon applications or supporting papers outside the ones before him
17  ... because each application standing alone must satisfy the necessity requirement."  (Doc. #
18  77 at 20).  In addition, Defendant contends that the application relied upon boilerplate
19  conclusions that describe the inherent limitations of normal investigative procedures and failed
20  to distinguish investigative problems in the present case from any other drug conspiracy case.
21  The Government contends that the March 2007 affidavit of Special Agent Skjei
22  provides a full and complete statement of the manner in which the Government agents utilized
23  various investigative methods before seeking wiretap authority.  The Government contends
24  that the March 2007 affidavit properly incorporated the prior affidavits from the November
25  2006 and the January 2007 applications in support of the March 2007 application.  The
26  Government asserts that the March 2007 affidavit of Special Agent Skjei properly described
27  in detail the Government's use of other investigative techniques, the dangers posed by the
28  other investigative techniques, and the reasons why these investigative techniques were not

reasonably likely to succeed.

Section 2518(1)(c) provides that the affiant in support of an application for a wiretap must provide "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). "*Each* wiretap application, standing alone, must satisfy the necessity requirement." *United States v. Carneiro*, 861 F.2d 1171, 1176 (9th Cir. 1988). The "full and complete statement" requirement of Section 2518(1)(c) is satisfied where the affidavit provides "specific probative facts" which "show with specificity why *in this particular investigation* ordinary means of investigation will fail." *United States v. Commito*, 918 F.2d 95, 97-98 (9th Cir. 1990)(quotation omitted).

The prior affidavits from the November 2006 application and the January 2007 application submitted to the Court in support of the March 2007 application were explicitly incorporated into the March 2007 affidavit as a basis for review by the Court. The March 2007 affidavit detailed the investigation from January 11, 2007 through February 15, 2007 including information obtained in intercepted calls and phone analysis.  In the "Necessity" section of the March 2007 affidavit, Special Agent Skjei described in detail the use of confidential informants to investigate the criminal activity of the Posole gang. The March 2007 affidavit specifically identified portions of the November 2006 and the January 2007 affidavits providing detailed information regarding the use of two confidential informants. Agent Skjei provided further information regarding CI-1 and reasonably concluded that there is no realistic chance to penetrate the upper echelons of the Posole gang. Agent Skjei explained that the Posole gang has a significant reputation for violence and that much of the leadership is related by blood or marriage. Agent Skjei further detailed the problems presented by the fact that Jesse Moreno, Jr. was incarcerated in Ironwood State Prison and that correctional officers may be involved with Moreno's illegal activities. Special Agent Skjei detailed the undercover operation, physical surveillance, searches and seizures, grand jury/interviews, phone analysis, and prior wiretaps. In each case, Special Agent Skjei specifically identified portions of the November 2006 and the January 2007 affidavits providing detailed information regarding each

1 investigative technique. Special Agent Skjei provided detailed information for each
2 investigative technique regarding the progress made in the investigation since the January 2007
3 application and the specific reasons law enforcement had yet to accomplish the objectives of
4 the investigation. The Court concludes that the affidavit of Special Agent Skjei in support of
5 the March 2007 wiretap application provided a "full and complete statement" of "how normal
6 investigative procedures had been tried and failed, and why those procedures were reasonably
7 unlikely to succeed in this investigation in the future." *United States v. Canales Gomez*, 358
8 F.3d 1221, 1224 (9th Cir. 2004).

*Finding of Necessity*

10       Section 2518(3)(c) provides in relevant part that a judge may approve a wiretap if he
11 or she "determines on the basis of the facts submitted by the applicant that ... normal
12 investigative procedures have been tried and have failed or reasonably appear to be unlikely
13 to succeed if tried or to be too dangerous...." 18 U.S.C. § 2518(3)(c). "[T]he necessity
14 requirement is directed to the objective of the investigation as a whole, and not to any
15 particular person." *United States v. Reed*, 575 F.3d 900, 911 (9th Cir. 2009). Review of the
16 necessity requirement "includes an assessment of whether the affidavit attests that adequate
17 investigative tactics were exhausted before the wiretap order was sought or that such methods
18 reasonably appeared unlikely to succeed or too dangerous." *United States v. Gonzales*, 412
19 F.3d 1102, 1111 (9th Cir. 2005).

20       The Court of Appeals has "adopted a 'common sense approach' in which the reviewing
21 court uses a standard of reasonableness to evaluate the government's good faith effort to use
22 alternative investigative means or its failure to do so because of danger or low probability of
23 success." *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001). When considering
24 the statutory requirement of necessity under Section 2518(1)(c), "the Government is entitled
25 to more leeway in its investigative methods when it pursues a conspiracy." *United States v.*
26 *McGuire*, 307 F.3d 1192, 1198 (9th Cir. 2002). "[C]onspiracies pose a greater threat to
27 society than individual action toward the same end." *Id*. at 1197. In *McGuire*, the Court of
28 Appeals explained:

> Conspiracies pose other special dangers. Unlike individual criminal action, which comes to an end upon the capture of the criminal, collective criminal action has a life of its own. Like the Hydra of Greek mythology, the conspiracy may survive the destruction of its parts unless the conspiracy is completely destroyed. For even if some or many of the conspirators are imprisoned, others may remain at large, free to recruit others eager to break the law and to pursue the conspiracy's illegal ends. Reflecting this concern, we have consistently upheld findings of necessity where the traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of . . . other satellite conspirators. Because the government has a duty to extirpate conspiracy beyond its duty to prevent the mere commission of specific substantive offenses, we conclude that the government is entitled to more leeway in its investigative methods when it pursues a conspiracy.

*Id.* at 1197-98 (quotation and citations omitted).

The specific facts set forth in the March 2007 affidavit of Special Agent Skjei describe a conspiracy involving distribution of drugs and weapons; a closely related group of conspirators including individuals who are incarcerated; and a significant danger of violence including specific instances of intimidation of a confidential informant. The affidavit of Special Agent Skjei includes case-specific details of the investigation including the use of confidential informants, physical surveillance, searches and seizures, grand jury and subpoenas, witness interviews, phone analysis, and prior wiretaps. The affidavit explains the reasons each of these investigative methods was insufficient to achieve the goals of the investigation, which include the extent and scope of criminal activity by the Posole gang; the identification of co-conspirators, narcotics suppliers and narcotics purchasers; the identification of locations where controlled substances are manufactured, stored and distributed; the identification of locations where firearms are stored; and the identification of prison officials who may be associated with the illegal activities of the alleged conspirators. The affidavit adequately sets forth detailed facts to support the conclusion that the interception of wire communication was the only way to identify and investigate the extent of this alleged conspiracy, in which "the leadership level [is] related by blood and/or marriage, and [the conspirators] have grown-up together in the Posole neighborhood"; "individuals have been raised in a culture in which incarceration due to gang activities is an element of life"; and "gang members are aware of the fact that, if they cooperate with law enforcement, they face being executed by the Mexican Mafia." (March 6, 2007 Affidavit, page 23).

1       The Court concludes that the affidavit in support of the March 2007 application
2 adequately detailed the use of undercover agents and/or confidential informants, search
3 warrants and other traditional investigation procedures.  This Court properly concluded that
4 "[i]t has been adequately established that normal investigative procedures have been tried and
5 failed, reasonably appear unlikely to succeed if tried, or are too dangerous to employ."
6 (March 6, 2007 Order, page 3).

7 Continued Investigation

8       Defendant contends that law enforcement had adequate evidence to prosecute Frank
9 Sandoval, Valentino Moreno and Maria Perez prior to the application for the March 2007
10 wiretap order.  The Government contends that evidence to prosecute three of the over forty
11 target subjects did not preclude the use of a wiretap in the continued investigation.

12       "The mere attainment of some degree of success during law enforcement's use of
13 traditional investigative methods does not alone serve to extinguish the need for a wiretap."
14 *Canales-Gomez*, 358 F.3d at 1225.  Accepting as true Defendant's assertion that there was
15 sufficient evidence to arrest and prosecute Frank Sandoval, Valentino Moreno, and Maria
16 Perez prior to the application for the March 2007 wiretap, the Government was entitled to
17 continue its investigation of the fifty-nine other named individuals including the Defendant,
18 and others yet unknown concerning the importation and distribution of controlled substances;
19 the conspiracy to import and distribute controlled substances; and other crimes described in
20 the March 2007 application.  *See McGuire*, 307 F.3d at 1198 (The Ninth Circuit "ha[s]
21 consistently upheld findings of necessity where traditional investigative techniques lead only
22 to apprehension and prosecution of the main conspirators, but not to apprehension and
23 prosecution of other satellite conspirators."); *United States v. Bennett*, 219 F.3d 1117, 1121 n.3
24 (9th Cir. 2000) ("We have consistently upheld [] wiretap applications seeking to discover
25 buyers, suppliers, and conspiracy members.").  In this case, the continued investigation of
26 buyers, suppliers, and conspiracy members though the March 2007 wiretap order did not
27 violate the necessity requirement of Section 2518(3)(c).

28

Minimization

Defendant contends that law enforcement was required to suspend the interception of communication over T-4 immediately when Jesse Moreno, Jr. left prison and no other targets were involved in the communications over T-4. The Government contends that the probable cause determination to intercept T-4 was not affected by Moreno's parole from prison. The Government asserts that the Court determined there was probable cause to tap the unauthorized phone being used in the prison and that passing the phone to another user did not affect this determination.

Section 2518(5) provides: that "Every order shall contain a provision that the authorization to intercept shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must termination upon attainment of the authorized objective." 18 U.S.C. § 2518(5). "Authorization for a wiretap is based upon probable cause to believe that the *telephone* is being used to facilitate the commission of a crime, and the order need not name any particular person if such person is unknown." *Reed*, 575 F.3d at 910.

In this case, Special Agent Skjei informed the Court in the March 2007 affidavit as follows: "I believe that [T-4] is being used by Jesse Moreno Jr. I also believe that Moreno may be released from custody shortly. Based upon my experience, I do not believe that Moreno will take the phone from Ironwood State prison, but rather will likely pass the phone to another inmate associated with Moreno in order to coordinate illegal activities at Ironwood. In this vein, it is my understanding that Moreno's cellmate is a Varrio Posole Locos gang member, and thus would be a likely candidate to receive the phone from Moreno." (March 6, 2007 Affidavit, page 3). The Court found that there was probable cause that T-4 subscribed to by Maria Perez was being used by Jesse Patrick Moreno, Jr. while incarcerated at Ironwood State Prison to further the criminal activity of the conspiracy to distribute controlled substances as well as other crimes identified in the order. The March 2007 order authorizing the wiretap of T-4 properly provided in part that "IT IS FURTHER ORDERED that the interception of wire and electronic communications authorized by this Court's Order must terminate upon the

1  attainment of the authorized objectives...". (March 6, 2007 Order, Page 7). The Court
2  concludes that the Government had no obligation to terminate the interception of the wire
3  communications because Jesse Moreno, Jr. was released from prison and T-4 passed to another
4  prisoner. The Court had been informed in the affidavit that this transfer was anticipated and
5  found that there was probable cause to intercept the communication from the T-4. The Court
6  concludes that interception of the communications from T-4 did not violate any minimization
7  requirement of the March 2007 order.

## CONCLUSION

There are no grounds to suppress the wiretap evidence in this case and no misleading statements or omissions have been identified that would require an evidentiary hearing.

IT IS HEREBY ORDERED that the motion to suppress wire and electronic communication evidence filed by Defendant Cesar Diaz (Doc. #77) is DENIED.

DATED: February 9, 2010

*William Q. Hayes*
**WILLIAM Q. HAYES**
United States District Judge